

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00292-CR

David **CASTILLO**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 365th Judicial District Court, Zavala County, Texas
Trial Court No. 20-01-003847-ZCRAJA
Honorable Amado J. Abascal III, Judge Presiding

Opinion by:    Rebeca C. Martinez, Chief Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Patricia O. Alvarez, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: August 9, 2023

AFFIRMED

A jury convicted appellant David Castillo, Jr. of manslaughter, a second-degree felony, for the death of Able Longoria, and it assessed punishment at eighteen years imprisonment in the Texas Department of Criminal Justice. TEX. PENAL CODE ANN. § 19.04. In two issues, Castillo complains that the evidence is legally insufficient to support the jury's finding that he was not justified in using deadly force in (1) self-defense and (2) defense of a third person. We affirm.

## I. BACKGROUND

On the night of December 31, 2019, Longoria and his wife, Natalia Menchaca Vasquez, hosted a New Year's Eve gathering at their home in La Pryor, Texas (the "Longoria residence"). The guests included Longoria's nephew, Marco Antonio 'Tonio' Perez[1] ("Tonio"), and Vasquez's nephew, Abraham Perez. At approximately 2:00 a.m. on January 1, 2020, David Castillo, Jr.; David's son, Daniel Christian Castillo; and John Robert Villanueva arrived at the Longoria residence uninvited. A fight ensued. After the fight, David sought help from his bother-in-law, Jose Luis Balderas, Jr., a Texas Ranger. The jury considered Vasquez's, Tonio's, and David's varying accounts of the fight, and Ranger Balderas' recollection of David and Daniel shortly after the fight. It also considered the opinions of Corinne Stern, D.O., a forensic medical examiner.

### A. Natalia Menchaca Vasquez

Vasquez testified that after midnight on January 1, 2020, David, Daniel, and John arrived at the Longoria residence in Daniel's pickup. Vasquez told the three men to leave. Instead, Daniel punched Longoria in his face, and a fight ensued. David and John pulled Longoria away. Meanwhile, Daniel punched Vasquez's face, causing her to fall back and land on her knee. As Vasquez got up, she observed David and John punching and kicking Longoria. Daniel then punched Vasquez a second time, and she fell again. As Vasquez got up for a second time, she observed that Longoria was standing "like a scarecrow, and his left leg was kind of coming back and forth like he was in pain." She then retrieved a cell phone from Daniel's pickup, and she slammed it on the ground, believing that breaking the cell phone would draw the three men away from fighting with Longoria. Longoria then walked, hunched over, away from David, Daniel and John, and she then saw him fall over. As Vasquez laid Longoria out on the ground, she observed

---

[1] We will refer to most witnesses by the witness's first name for ease of reference.

that he "had been severely injured and he was full [sic] of blood." Vasquez acknowledged that she neither saw Longoria get stabbed nor anyone with a knife during the fight.

## B.     Marco Antonio 'Tonio' Perez

Tonio, who is also Daniel's cousin, witnessed David, Daniel, and John arrive at the Longoria residence. Tonio recalled David asking him, "Where is Able [Longoria] at?" Tonio responded, "For what? What are you–all needing — what are you–all doing there? What do you–all need?" Thereafter, an "argument" ensued. During the argument, Tonio witnessed Vasquez throw beer at Daniel's face, which provoked Daniel to strike Vasquez. Tonio then saw Vasquez "on the floor" and Longoria throw a punch toward David. Tonio broke up a fight between John and one of Tonio's relatives, and then saw David and Longoria on the ground fighting. As Tonio recalled, Longoria was on top of David and hitting him. Then, Longoria got up and started walking away. David tried to get up and follow Longoria, but Tonio pushed David back down and told him that his group needed to leave. Simultaneously, Longoria began fighting with Daniel. Tonio then saw that Longoria had been stabbed and that he was bleeding. Tonio, like Vasquez, acknowledged that he did not see Longoria get stabbed. David, Daniel, and John then returned to Daniel's pickup and left.

## C.     David Castillo, Jr.

David testified that after midnight on January 1, 2020, his son Daniel arrived at his house. David noticed that Daniel had been drinking. Daniel then decided to drive to the Longoria residence to pick up Abraham Perez.[2] David accompanied Daniel to the residence, concerned because of an enhanced law enforcement presence on New Year's Eve.

---

[2] Abraham had also attended the New Year's gathering, had texted Daniel to pick him up from the Longoria residence but left with his brother before David, Daniel, and John arrived.

Daniel parked along the road near the Longoria residence and exited the pickup. David and John stayed in the pickup. David observed Daniel talking with Tonio, and then Tonio waived "maybe eight or ten" people toward the two. David and John then exited the pickup and approached the group. David recalled Longoria striking his head with an object and being knocked to the ground. "Everyone" began fighting. He witnessed Longoria and Vasquez "on top of" Daniel, and Longoria was hitting Daniel with an object in his hand. David exclaimed to Longoria, "that's enough," as he tried five or six times to pull Longoria off Daniel. Eventually, David pulled Longoria off Daniel, and Longoria fell on top of David. As the two were on the road, Longoria hit David and told him, "I am going to kill you, you son of a b----." Vasquez then approached, and she kicked David twice. David then described:

Q.    How were you injured?

A.    I was hit in the head with some object. And he was striking me, striking me, and — and I — he was — he was blowing. He had something in his hand he was hitting me with. I do not know what it was.

Q.    And then what happened?

A.    I couldn't find nothing. I couldn't find nothing to protect myself. And I had been cooking all day and I had put the knife in my pocket[,] and I had no other choice. He was telling me he was going to kill me, and I — I had to get him off of me.

Q.    And what did you do next?

A.    I bumped him with the knife.

Q.    What happened after that?

A.    He still kept punching me, and, finally, I was able to push him off of me.

Q.    What did you do next?

A.    I got up and I started running. Everybody was chasing me.

David hopped in the bed of Daniel's pickup, and Daniel drove to David's residence. As they drove away, David threw away the knife that had used to stab Longoria. Upon arriving home, he noticed that Daniel had sustained injuries during the fight. Specifically, Daniel's face was "all purple," his eyes "were almost shut," and Daniel was holding his body. David was concerned that Daniel was injured to the point of needing medical attention, and drove Daniel to the home of Ranger Balderas, whose wife is a nurse. He told Ranger Balderas that Daniel needed medical attention and that he had to stab Longoria. Ranger Balderas called the sheriff's office and requested an ambulance to transport Daniel to San Antonio for medical treatment. Meanwhile, David was taken to a justice of the peace. David denied stabbing Longoria to the police because he was scared.

On cross examination by the State, David denied knowing there was going to be a confrontation between Daniel and Longoria when he accompanied his son to the Longoria residence. He did not know how he got the folding pocket knife out of his pocket, unfolded it, and stabbed Longoria, all while Longoria was on top of and hitting him. David also denied being told to leave the Longoria residence.

**D.      Ranger Jose Luis Balderas, Jr.**

Ranger Balderas testified that at approximately 2:35 a.m. on January 1, 2020, he was awakened by Daniel knocking on his front door. Daniel was accompanied by David. Ranger Balderas observed that David's blue jeans contained what he believed was blood, and that he had sustained a possible injury to his right temple area. On Daniel, Ranger Balderas observed that he had swelling around his eyes, was holding his right rib area, appeared pale, and "was unsteady on his balance." Daniel lifted his shirt and showed Deputy Balderas "several small puncture wounds and some abrasions or scratches."

Ranger Balderas testified that David told him:

Q.  You — Ranger, you mentioned that [David] said it in both English and Spanish.

A.  Yes, sir.

Q.  What did he say in English?

A.  He — he said — what he told me was both in English and in Spanish; but you're asking me what he — is that — just so I understand the question . . . .

Q.  What did he say to you in Spanish?

A.  What he said was (speaking Spanish). I had to.

Q.  And are you fluent in English and Spanish?

A.  Yes.

Q.  And what — what does that translate to in English?

A.  Why am I going to lie to you, Jose Luis? I understand filero — filoriar (in Spanish) to be slabbed (sic) or stashed (sic), and then he said in English: I had to.

Ranger Balderas then called the Zavala County Sheriff's Office to request that a deputy come to his residence.

Ranger Balderas testified that he understood David's statement of "I had to," as meaning that David "had to do something, either to — to assist in either helping out himself or helping out his son, Daniel, somehow." Deputy Balderas recalled that an ambulance transported David and Daniel to a hospital for medical evaluation and treatment.

**E.  Corinne Stern, D.O.**

On January 2, 2020, Dr. Stern performed an autopsy on Longoria's body. Dr. Stern's autopsy revealed that Longoria had recently sustained several injuries. Dr. Stern determined that the cause of death was a stab wound that severed the major artery and vein in Longoria's left armpit and caused Longoria to die by exsanguination, which means "he bled to death."

During an inventory of items on Longoria's person, Dr. Stern discovered two small baggies that had a pictorial of a devil's head on them. Dr. Stern suspected that the baggies contained contraband, and she turned them over to a Texas Ranger. Toxicology analysis revealed that Longoria had a .038 blood alcohol content and that he had amphetamine and "a pretty high level of methamphetamine in his blood." Dr. Stern explained that methamphetamine causes an elevated heart rate, bursts of strength, and aggression.

**F.      Verdict**

The jury charge asked the jury to determine whether David was guilty or not guilty of murder, manslaughter, or criminally negligent homicide. The jury charge also included on instruction on self-defense and defense of "another person." The jury found David guilty of manslaughter and assessed punishment at eighteen years imprisonment in the Texas Department of Criminal Justice. The trial court signed a judgment in accordance with the jury's verdict. David timely appealed.

**II. DISCUSSION**

**A.      Standard of Review**

When a defendant challenges the legal sufficiency of the evidence to support rejection of a defense such as self-defense or defense of a third person, the question is not "'whether the State presented evidence which refuted appellant's self-defense [evidence].'" *Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)); *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The question becomes, for the reviewing court, whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and additionally, would have found against the defendant on the necessity defense beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914. Legal

sufficiency is measured according to a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009).

Once a defendant has introduced some evidence supporting a defense, the State continues to bear the burden to prove its case beyond a reasonable doubt, but it does not have a burden to introduce evidence to disprove the defense. *Zuliani*, 97 S.W.3d at 594. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). When conducting an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

## B.      Applicable Law

A person commits the offense of manslaughter if he recklessly causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.04(a). A person acts recklessly if he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Id*. at § 6.03(c).

Under Texas law, self-defense is defined as follows:

[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. The actor's belief that the force was immediately necessary as described by this subsection is presumed to be reasonable if the actor:

(1)      knew or had reason to believe that the person against whom the force was used:

   (A)      unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;

   (B)      unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or

(C)     was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery;

(2)     did not provoke the person against whom the force was used; and

(3)     was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

*Id*. at § 9.31(a). "Reasonable belief" is defined as one that would be held by "an ordinary and prudent man in the same circumstances as the actor." *Id*. at § 1.07(a)(42). Use of force is not justified in response to verbal provocation alone. *Id*. at § 9.31(b)(1).

A person is justified in using deadly force in self-defense if he would be justified in using force against another person under Section 9.31 and if the person "reasonably believes that deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force . . . [or] to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery." *Id*. at § 9.32(a). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id*. at § 9.01(3).

Regarding defense of a third person, a person is justified in using force or deadly force against another to protect a third person if:

(1)     under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and

(2)     the actor reasonably believes that his intervention is immediately necessary to protect the third person.

*Id*. at § 9.33.

## C.    Analysis

In David's first and second issue, he challenges the legal sufficiency of the evidence supporting his conviction on one count of manslaughter.  Specifically, David argues that there is legally insufficient evidence to disprove his claim of self-defense and defense of a third person beyond a reasonable doubt.  Primarily relying on his own testimony, David argues that "[t]he Longoria crew were the aggressors."  David highlights his recollection of events, specifically that Daniel was summoned by Abraham — as corroborated by Abraham's testimony — to the Longoria residence, and that he and John waited in Daniel's pickup until Tonio waived "maybe eight or ten" people toward where Tonio and Daniel were talking.  David also underscores that Longoria struck his head with an object and told him, "I am going to kill you, you son of a b----."  David further points to Dr. Stern's testimony that methamphetamine causes bursts of strength and aggression to support his argument that Longoria's attack was charged with "superhuman strength," which in turn necessitated his use of deadly force in defense of himself and Daniel.

The State responds by arguing that the jury may have reasonably inferred that Daniel provoked Longoria by appearing uninvited at Longoria's New Year's Eve gathering.  The State highlights Vasquez's recollection that she asked the three men to leave and that, instead, Daniel punched Longoria in his face, which started the fight.  The State argues that the jury may have disregarded David's testimony that Longoria told him, "I am going to kill you, you son of a b----," in the moments before David "bumped" Longoria with the pocketknife.  As for David's defense of Daniel, the State emphasizes that the jury may have rejected this defensive theory because Daniel was in no jeopardy from Longoria when David "bumped" him.

Viewing all the evidence in the light most favorable to the verdict, we conclude that it is legally sufficient.  Vasquez, Tonio, and David provided varying eyewitness accounts of the fight.  While Tonio's testimony suggests that Vasquez's throwing a beer at Daniel's face provoked him

to strike Vasquez, the jury may have nevertheless credited Vasquez's recollection of who provoked whom over Tonio's recollection. *See Isassi*, 330 S.W.3d at 638; *see also* TEX. PENAL CODE ANN. § 9.31(a)(2). Similarly, the jury may have also credited Vasquez's testimony that Daniel provoked Longoria before David and John joined the fight. The jury may have found David's testimony not credible because he told Ranger Balderas that he "had to" stab Longoria, denied stabbing Longoria to the police, and admitted to "bumping" Longoria with his pocketknife at trial. *See McClesky v. State*, 224 S.W.3d 405, 409 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (concluding that the jury could rationally have found appellant's testimony not to be credible because she gave different versions of the events); *see also Denman v. State*, 193 S.W.3d 129, 133 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding that an accused's testimony alone will not conclusively prove self-defense as a matter of law). Accordingly, the jury may have rejected David's testimony that Longoria was the initial aggressor. It may also have concluded that, if David believed that he needed to use deadly force as he fought Longoria, such a belief was unreasonable. *See* TEX. PENAL CODE ANN. § 9.32(a); *see also Denman*, 193 S.W.3d at 133. The jury may have reached a similar conclusion regarding David's defense of Daniel, who had not been fighting with Longoria at the time David stabbed him.

David's first and second issues are overruled.

### III. CONCLUSION

We affirm the trial court's judgment.

Rebeca C. Martinez, Chief Justice

DO NOT PUBLISH